# EXHIBIT A

I, Kenneth Kelly declare as follows:

## BACKGROUND

1.  I am a Special Agent with the U.S. Postal Service (USPS) OIG. In 1992, after being honorably discharged as an officer from the U.S. Navy, I began my federal law enforcement career as a uniformed Immigration Inspector with the Immigration and Naturalization Service (INS). I became a Special Agent with INS in 1996, where I was assigned to various teams, including the FBI Joint Terrorism Task Force (JTTF).

2.  I then transferred to the U.S. Treasury Department Office of Inspector General (OIG) as a Special Agent in 2000 and later accepted a position as a Special Agent with the USPS OIG in 2004, where I am currently assigned to the Orlando office of the Southern Area Field Office. I have received training in the investigation of various aspects of white collar fraud as well as specific training in conducting health care fraud and money laundering investigations.

3.  I am authorized to investigate violations of the laws of the United States and execute warrants issued under the authority of the United States. I have investigated individuals for health care fraud who were prosecuted in federal court, and have successfully obtained and executed federal search warrants to obtain evidence.

4.  I make this affidavit in support of a civil in rem complaint against funds seized from three accounts (together, "Defendant Property"), which are associated in various ways with Amerimed Diagnostic Services, Inc. (Amerimed) located in Tampa, Florida:

A. **Approximately $477,126.47, seized from Wells Fargo Bank Account Number 2000015847191, Held In The Name Of Amerimed Diagnostic Services Inc.** (proceeds of health care, mail, and wire fraud and property intended to promote the fraud);

B. **Approximately $15,300 seized from Wells Fargo Bank Account Number 1010183883049, Held In The Name Of Guidover Manso** (proceeds of health care, wire, and mail fraud); and

**C. Approximately $38,322.00, seized from $38,322 in Suncoast Schools Federal Credit Union, Account Number 3079188, Held In The Names Of Neisy Munoz and Lazaro O. Munoz** (proceeds of health care, mail, and wire fraud).

5.    A joint investigation by USPS OIG, the U.S. Department of Labor (DOL) OIG, the U.S. Department of Veterans Affairs (VA) OIG, and the U.S. Department of Homeland Security (DHS) OIG has revealed that the owners, operators, officers, and other financial beneficiaries of Amerimed and FWCC (hereinafter collectively referred to as "the conspirators") have defrauded the United States government by submitting claims for millions of dollars in reimbursement for medical services that were medically unnecessary and/or never provided.

6.    Specifically, from early January 2011 until the present, the conspirators engaged in a scheme to defraud the United States government, in violation of 18 U.S.C §§ 1035, 1347, and 1349, in order to obtain payments through Office of Workers' Compensation Programs (OWCP), a U.S. Government health care program providing benefits under the Federal Employees Compensation Act (FECA). The conspirators also conducted financial transactions to promote the fraud in violation of 18 U.S.C § 1956. In furtherance of this scheme to defraud, documents have been submitted to the U.S. government through interstate mails and wires which, in turn, have caused funds to be electronically deposited via interstate wires into the bank accounts of Amerimed and, thereafter, FWCC, in violation of 18 U.S.C. §§ 1341 and 1343.

7.    As set forth in more detail below, there is probable cause to believe that the Defendant Property constitutes proceeds of these violations of 18 U.S.C. §§ 1341, 1343, and 1347, and/or is property involved in violations of 18 U.S.C. § 1956.

8.    The information contained in this affidavit is based upon my investigative efforts and those efforts of other agents, analysts, and officials of the United States.  In particular, Michael McClung, a Senior Inspector with the United States Marshals Service (USMS), and a Deputy U.S. Marshal (DUSM), reviewed and analyzed the financial records forming the basis of the section of this affidavit addressing the activities associated with each of the relevant accounts.  As an Asset Forfeiture/Financial Investigator for the USMS, Inspector McClung received extensive training in financial investigative techniques from the Department of Justice – Asset Forfeiture Money Laundering Section, the Treasury Department and the Federal Law Enforcement Training Center.  The courses provided advanced training in investigative techniques used to investigate Money Laundering and Bank Secrecy Act violations and identifying assets subject to criminal and civil forfeiture. In addition, he holds a Certified Fraud

Examiner designation and holds a Bachelor of Science Degree in Criminology from the University of South Florida in Tampa, Florida.

9.      This investigation has also involved the review of medical and billing records, undercover video, and interviews of Amerimed patients and former Amerimed employees, as well as physicians involved with Amerimed. Since this affidavit is being submitted for the limited purpose of securing a seizure warrant, it does not include each and every fact known to me, but only information sufficient to support a reasonable belief that the government will be able to meet its burden of proof at trial—specifically, that the government will be able to show by a preponderance of the evidence that the Defendant Property is subject to forfeiture.

## CURRENT PROCEDURAL TERMINOLOGY (CPT) CODES

10.      CPT codes are published by the American Medical Association (AMA) and serve as the uniform coding system used to identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians. The CPT also identifies equipment and materials supplied by medical equipment suppliers and other health care providers. The CPT coding system is accepted by both private insurers and public health care benefit programs for the reporting of procedures and services performed by medical professionals. A CPT code is a five-character, alphanumeric identifier that is intended to simplify reporting and to accurately identify equipment and services being supplied to a patient/claimant. Medical providers indicate, on their claims for payment, CPT codes that identify the types of equipment or services for which the OWCP is being charged.

11.      Medical practices routinely bill for 'Evaluation and Management' (E/M) as part of the services provided to patients. Generally, for both new and established patients, E/M services can be billed at five different levels. In selecting the appropriate E/M level, providers must consider several components. These components include the following:

- history of the patient;
- nature of the problem presented by the patient;
- type of examination conducted;
- complexity of medical decision-making involved;
- counseling, if given;
- coordination of care; and
- overall time involved;

After considering the effect of these different components, a provider will then bill for the appropriate E/M level. A billing code for a level one E/M visit represents the lowest levels of time and complexity of the medical decision required from a provider for a particular patient visit. In contrast, a code for a level five E/M represents the highest levels of patient complexity and involvement by the provider.

12. Among the CPT codes used for billing varying E/M levels, code 99215 is particularly relevant to this investigation. Per the CPT code manuals, a provider may properly bill for CPT code 99215 only if two of the following three components are met with respect to a particular visit:

- a comprehensive evaluation of the patient's medical history;
- a comprehensive examination of the patient; and
- medical decision-making of high complexity.

According to the American Medical Association ("AMA"), a 99215 code should be billed for patient visits involving problems "of moderate to high severity. Physicians typically spend 40 minutes face-to-face with the patient and/or family." Given these complexities, CPT code 99215 is reserved for the highest E/M (level 5) that can be billed by a provider for an established patient.

13. Also relevant to this investigation are CPT codes 99358 and 99359. These two codes are designated to capture the amount of time that a physician works on a particular patient's case but not involving direct (face-to-face) care. As such, these two CPT codes measure the total duration of non-face-to-face time spent by a physician on a given date time. Code 99358 is used to report the first hour of this "prolonged service." Code 99359 is used to report each additional thirty minutes beyond that first hour.

14. Another pertinent code is CPT code 99080. Code 99080 gives the reporting physician a means of identifying the completion of special reports and services that are in addition to the basic services rendered to a particular patient. Included within this range of services, CPT code 99080 is specifically designated for "special reports such as insurance forms, more than the information conveyed in the usual medical communications or standard reporting form."

15. Finally, CPT Code 99070 is also particularly relevant to this case. This CPT code accounts for the supplies and materials provided to a patient that are over and above those usually included with an office visit or other services rendered.

## FECA & OWCP

16.    The Federal Employees Compensation Act (FECA), as codified in 5 U.S.C §§ 8101 -- 8193, is administered by DOL, Office of Workers' Compensation Programs (OWCP).   FECA provides compensation benefits to civilian employees of the United States for disability due to personal injury sustained while in the performance of their duties.   FECA also covers all medical expenses for the treatment of an employee's injuries, including medical treatment, rehabilitation services, medical tests, physical therapy, and medical supplies and equipment.

17.    All providers are required to enroll with DOL-OWCP through its designated bill processing agent, ACS, in order to receive payment from the U.S. Treasury Department. After enrolling with ACS, providers may submit claims for electronic payment and request pre-authorization for certain services with an assigned ACS provider number.

18.    In order to receive reimbursement from DOL-OWCP for services or procedures rendered, providers must submit Health Insurance Claim Forms (commonly referred to as an "HCFA-1500" form).  Relevant to each patient visit, a provider will list all of the applicable CPT codes on the HCFA-1500 form.  HCFA-1500 forms may be submitted either electronically or in hard copy. Once a claim is submitted and approved for reimbursement, DOL-OWCP pays the providers with U.S. Treasury funds via interstate wires of electronic deposits or via checks sent via interstate mail.

19.    When providers submit claims to DOL-OWCP, they certify that the service for which reimbursement is being sought was performed as described, and was necessary, appropriate, and properly billed in accordance with accepted industry standards.  Similarly, when providers accept payments from DOL-OWCP, they re-certify the same regarding the services for which reimbursement were sought. Among other practices, accepted industry standards preclude "up-coding"; that is, billing for extended medical appointments or services that were not in fact provided to the patient.  These accepted standards also prohibit the "unbundling" of services; that is, billing multiple CPT codes for services that were adequately and appropriately billed under a single CPT code.

20.    In order to receive payment, OWCP requires health care providers to submit documentation for the services provided to the injured federal employees. Over the course of this investigation, numerous forms generated by Amerimed were mailed to OWCP in order to receive payment. These forms include examination reports, prescription notes, and letters from Amerimed to OWCP in support of these claims.

These documents were mailed via interstate mail from Amerimed's main office in Tampa, to OWCP at P.O. Box 8300, District 6, London, KY 40742-8300. This post office box was set up by OWCP specifically to receive all claim documentation which is then electronically scanned into the claimant's OWCP file.

21.     Amerimed also submits invoices electronically to OWCP through the ACS web portal which can be accessed on-line from the computers at Amerimed. These invoices, HCFA-1500, are submitted electronically for every treatment or service provided by Amerimed along with the relevant CPT code. Once OWCP reviews and approves these invoices, a payment is deposited electronically into Amerimed's bank accounts using the information they provided to OWCP. These payments travel via interstate wire from the US Treasury Department in Washington, DC, to Amerimed's bank accounts in Tampa, Florida, and elsewhere.

## AMERIMED DIAGNOSTIC SERVICES, INC.

22.     According to records from the Florida Department of State, Amerimed was registered as a for-profit corporation on October 30, 2002, with a principal address of 500 W. Martin Luther King Blvd., Tampa, FL 33603 (MLK Location). The listed corporate officers were as follows:

- President -- Oscar Torres;
- Vice President -- Carmen Fernandez;
- Treasurer -- Guidover Manso, Sr.; and
- General Manager -- Mary K. Manso (a/k/a Marisleidy Manso).

In addition to these officers, Lois Luis (a/k/a Ireno Luis Delgado) managed the day-to-day operations at the MLK Location.

23.     On or about April 1, 2014, investigators reviewed the tax and ownership documents for Amerimed located with the Hillsborough County, Florida, Tax Assessor. These documents show that the MLK Location was purchased on or about October 20, 2000, by Ireno Luis (a/k/a Lois Luis), and Carmen Fernandez for $250,000.  On or about January 30, 2007, Ireno Luis executed a quit claim deed and transferred his ownership of the MLK Location to Carmen Fernandez. Notably, this sale in 2007 occurred within weeks of Ireno Luis being charged (on or about February 26, 2007) for his involvement in a health care fraud scheme operating out of that same MLK Location.  Based on his conduct in that health care fraud scheme, Ireno Luis ultimately pleaded guilty to conspiracy to commit mail fraud and was sentenced to 41 months incarceration.

## INVESTIGATION INTO AMERIMED

24.    On or about August 3, 2012, law enforcement served a subpoena on Amerimed, seeking billing records relating to 14 patients. During the time period covered in those 14 patient files, Dr. Samy Bishai was the primary physician at Amerimed.[1] A review of his billing practices revealed that Dr. Bishai regularly billed for a level 5 E/M visit (CPT code 99215), plus an extended office visit (CPT code 99358), and then also for the filing of a special report (CPT code 99080).  On many of those office visits, Dr. Bishai also billed for an additional extended office visit (CPT code 99359) beyond the first extended office CPT code (99358). In order to justify this level of billing, OWCP regulations require a physician to complete substantial documentation justifying additional treatment time over and above the normal examination report completed for a routine visit. None of the required documentation was found in the patient records.

25.    The review also found that Dr. Bishai routinely ordered for each patient a similar battery of testing, including nerve conduction studies, ultrasounds, acupuncture, and massage and physical therapy. Interviews with other physicians (listed below) disclosed that this amount of treatment was far in excess of the treatment normally provided to patients with these conditions. In addition, the records revealed that items routinely used in physical therapy – such as cream, lotions, and towels -- and for which a separate billing is not authorized, were repeatedly billed by Dr. Bishai under CPT code 99070 (special supplies). This CPT code is only used to bill for items over and above those items routinely used in patient treatment. Creams, lotions, and towels are not billable under this code.   The 14 patient files also contained copies of the documents sent to OWCP via interstate mail by Amerimed seeking reimbursement for those services.

26.    On May 22, 2013, a second review of these patient records was conducted by a Registered Nurse from USPS OIG who noted the following irregularities, among others:

- Dr. Bishai's progress notes for different patients appeared to be "cookie cutter," in that Dr. Bishai seems to make identical, or nearly identical, findings in different and unrelated patients' files;

- Despite billing for a level 5 E/M office visit (CPT code 99215), along with a prolonged office visit (CPT code 99358) and additional special reports

---

[1] Approximately four other physicians have been identified as being associated with and/or working at Amerimed.

(CPT code 99080) for each patient visit, there was no documentation explaining or justifying the complexity of those visits or the additional physician time (which would amount to over two hours per the CPT codes that were billed);

- There appeared to be no improvement in any of the claimant's conditions, despite years of physical therapy and acupuncture;

- The documentation for acupuncture and therapy was identical for each session; and

- Amerimed billed for the professional component and interpretation of diagnostic tests, which would have been billed separately by the professional interpreting those results. In other words, the facility which conducts testing normally provides a report interpreting the test results. The treating physician should not bill an additional charge for interpreting the tests. Regardless, Amerimed often billed an additional charge for the interpretation of these tests. Amerimed billed OWCP for an interpretation that Amerimed did not and could not perform, which resulted in OWCP paying twice for an interpretation of the same test.

## BILLING PRACTICES AT AMERIMED

27.    On or about May 28, 2013, investigators conducted a general review of billing to OWCP from January 1, 2008, to May 7, 2013, for treatment of injured Postal employees.  This analysis revealed the following regarding Amerimed's billing practices vis-à-vis other health care providers in Florida billing for the same CPT code:

- Amerimed was the second highest out of 547 health care providers billing for CPT code 99080 (additional reports);

- Amerimed was the third highest out of 189 heath care providers billing for CPT code 99070 (supplies and material);

- Amerimed was the second highest out of 487 health care providers billing for CPT code 99215 (level 5 E/M office visit); and

- Amerimed was the highest out of only 28 health care providers who billed for CPT code 99358.  Similarly, Amerimed was the highest out of only six providers who billed for CPT code 99359.  Notably, CPT code 99358

(which accounts for an hour of additional non-face-to-face care) and CPT code 99359 (which accounts for each additional 30 minutes of non face-to-face care beyond the hour billed under Code 99358 code) are very rarely billed by OWCP health care providers because of the extensive treatment time required to justify billing under those Codes.

### CPT code 99215: Level 5 E/M Visits

28.      On national average, OWCP health care providers billed CPT code 99215 (level 5 E/M office visit) in approximately 5% of all patient visits. As for Amerimed, from on or about May 1, 2013, to on or about December 27, 2013, the clinic submitted a total of 2,959 billings to OWCP for varying levels of E/M visits by its patients.   Of those 2,959 billings, 2,274 were coded and billed as level 5 E/M visits (CPT code 99215).  In other words, Amerimed billed for level 5 visits nearly 77% of the time (compared to the national average of 5%).

29.      Pursuant to the investigation into Amerimed's billing practices, especially the high percentage of level 5 visits, agents asked the Medical Director for OWCP, Dr. Theodore Yee, to review a sample of Amerimed's records.  In particular, agents asked Dr. Yee whether Amerimed's files contained the appropriate documentation to justify billing for a level 5 E/M visit. At the outset, Dr. Yee explained that determining the appropriate E/M level for a visit is governed by guidelines published by the Center of Medicare and Medicaid Services. When making these determinations, Dr. Yee added, the benefit of the doubt is given to the provider.  Dr. Yee then reviewed the supporting documentation in the files relating to twenty visits to Amerimed by patients, all of which were conducted by Dr. Bishai.  Each of the twenty visits was billed to OWCP as a level 5 E/M visit (CPT code 99215).  According to Dr. Yee's review, none of the documentation in the files justified such a high level of E/M billing.

### CPT codes 99358 and 99359: Non-Face-to-Face Time

30.      Based on the inordinately high percentage of level 5 E/M visits (CPT code 99215) billed by Amerimed, law enforcement conducted a random, four-day sampling of total billing by Amerimed.  The dates selected for review were January 17, 2013, February 13, 2013, May 14, 2013, and August 27, 2013.  All of the billed medical services performed during those four days were done by a single physician, Dr. Samy Bishai.  Further analysis of these days showed as follows:

- On January 17, 2013, Dr. Bishai billed 17 patient visits for a level 5 E/M (CPT code 99215) and included an extra 1.5 hours of non-face-to-face time for each patient (CPT codes 99358 and 99359).  In total, based on an

average duration of 40 minutes for a level 5 E/M visit, Dr. Bishai billed 36 hours of work on that single workday.

- On February 13, 2013, Dr. Bishai billed 12 patient visits for a level 5 E/M (CPT code 99215) and included an extra 1.5 hours of non-face-to face time for each patient (CPT codes 99358 and 99359). In total, based on an average duration of 40 minutes for a level 5 E/M visit, Dr. Bishai billed for 26 hours of work for that single workday.

- On May 14, 2013, Dr. Bishai billed for 10 patient visits for a level 5 E/M (CPT code 99215) and included an extra 1.5 hours of non-face-to-face time for each patient (CPT codes 99358 and 99359). In total, based on an average duration of 40 minutes for a level 5 E/M visit, Dr. Bishai billed for 21 hours of work on that single workday.

- On August 27, 2013, Dr. Bishai billed for 9 patient visits for a level 5 E/M (CPT code 99215) and included an extra 1.5 hours of non-face-to-face time for each patient (CPT codes 99358 and 99359). In total, based on an average duration of 40 minutes for a level 5 E/M visit, Dr. Bishai billed for 18 hours of work on that single workday.

### CPT code 99080: Special Reports

31.    Additionally, with respect to this four-day sample, the patient records were reviewed to determine whether Dr. Bishai included proper documentation to support the billing of CPT code 99080 (Special Report). This CPT code is used to bill for reports that a health care provider completes which are over and above the normal documentation the physician must complete as part of a standard office visit. Such forms typically include the physician's examination report or Duty Status Report (Form CA-17) which is normally completed as part of an outpatient office visit. As such, a physician should not bill under 99080 (Special Report) for completing these forms. The physician should bill under this code only if additional reports are required. If a provider bills pursuant to CPT code 99080, then the provider must submit the actual report to OWCP to support the claim.

32.    Of the files relating to the four-day period, however, in many instances there were no documents in the file to support any additional billing. Specifically, for the patient files from January 17, 2013, five files had no documents to support a special report under CPT code 99080. The same was true for six of the patient files from February 13, March 14, and August 27, 2013, respectively.  Therefore, as to each of those files, Amerimed billed OWCP for reports that were never prepared.

### Modifier 26

33.    Many CPT codes include various "modifiers." A modifier allows the provider to account for a service/procedure that was altered by some unique circumstance but nonetheless billable under the general CPT code.  Stated simply, modifiers allow for additional information to be included with the CPT code for a particular claim. These modifiers affect the amount the physician will be reimbursed for that service/procedure.  Modifiers can be applied to CPT codes for E/M, as well as other procedural codes.

34.    As applied here, certain procedures are comprised of both professional and technical components.  When a physician's professional component is reported separately, however, then that service may be linked to corresponding procedural CPT code by including the modifier 26.  For example, if a provider conducted an MRI of a patient at its own imaging center (technical component) but the interpretation of the study was done by a radiologist from another provider (professional component), then attaching modifier 26 to a CPT code would be appropriate.   In this example, both the imaging center and the radiologist would bill for each portion of the services provided – that is, the imaging center would bill for the procedure and the radiologist would bill for the same CPT code but include the modifier 26 to it.  Conversely, if the same provider performs both the technical and professional components, then the inclusion of the modifier 26 is not necessary.

35.    During the review of Amerimed's billing history, it was determined that when diagnostic testing was performed (i.e., MRI's, ultrasounds), Amerimed would routinely divide the billing over two dates of service (usually over consecutive days).  On the first date of service, Amerimed would bill for the applicable CPT code for the diagnostic test. Then, on the second date of service, Amerimed would bill for the identical CPT code along with the Modifier 26.  As both components of the diagnostic test were performed by Amerimed (or persons contracted with Amerimed), only one date of service with a single CPT code should have been billed.  By billing the same CPT code again with the modifier 26 as a second date of service, Amerimed double-billed a single procedure and fraudulently received an increased reimbursement.

36.    Again using the same four-day sample as above, investigators conducted a review of the files to determine the extent of billing by Amerimed with respect to the Modifier 26.  With respect to January 17, 2013, Amerimed improperly billed the Modifier 26 approximately 26 times.  As for February 13, May 14, and August 27, 2013, Amerimed fraudulently billed the Modifer 26 on 12, 3, and 37 times, respectively.

### Extensive Treatment Period

37.     Another indicator of fraudulent billing by Amerimed is that only a small proportion of patients treated at Amerimed ever return to work in any capacity. A review of Amerimed's billing data disclosed that from January 2011 through June 2013 a total of 121 injured Postal Service employees received treatment at Amerimed, but only 26 (21%) returned to work at the Postal Service. The remaining 79% continued to receive treatment at Amerimed for their workplace injuries. Interviews with other physicians (see below) who are experienced in treating OWCP patients revealed that 77% is an unusually high percentage of patients to be deemed totally disabled and unable to return to work.

## PHYSICIAN INTERVIEWS

### Dr. Eve Hanna, M.D.

38.     On or about April 18, 2014, investigators interviewed Dr. Eve Hanna, M.D., Program Chief of the Department of Occupational Health for the Veterans Administration ("VA") center at the James A. Haley Veterans Hospital in Tampa, FL. Dr. Hanna is Board Certified in Occupational Medicine and has served as the Program Chief of Occupational Health at the VA hospital since 2003.

39.     In her role at the VA hospital in Tampa, Dr. Hanna periodically meets with the VA personnel who handle the OWCP claims.  Based on those interactions, Dr. Hanna discovered that nearly every injured employee from the VA went to Amerimed for treatment. Given the number of other physicians in the Tampa area, it is unusual for all of the injured employees to seek treatment at the same physician. Dr. Hanna also informed agents that she knows Lenny Perez (owner/operator of FWCC) to be associated with Amerimed and, in fact, Perez has trained VA union representatives on how to successfully process OWCP claims to ensure acceptance and payment by DOL. Dr. Hanna also learned that VA union officials give Perez's business cards to injured VA employees and direct them to Amerimed for treatment.  Dr. Hanna is aware that Perez charges the injured employees a monthly fee for his services.

40.     Apart from her speaking with investigators, Dr. Hanna independently conducted an analysis of recent OWCP claims by approximately 34 VA employees and prepared a report of her findings.  Based on that analysis, Dr. Hanna discovered that of those 34 injured employees who sought treatment at Amerimed, 30 were found to be totally disabled, yet only one required surgery. Ultimately, of the original 34 VA

employees seen by Amerimed, only two returned to full duty at the VA (and that was only after DOL denied their injury claims), while the others who returned did so with restricted duties.

41.     Dr. Hanna also believes that Amerimed patients were not receiving treatment in accordance with the standards of care accepted throughout the medical profession. For example, Dr. Hanna noted that the medically accepted duration of disability from a lumbar strain is between 3 and 28 days, yet the average disability duration for this injury at Amerimed was 321 days.  As another example, Dr. Hanna explained that the recommended disability duration for a cervical sprain/cervical radiculopathy is between 5 and 7 days, yet the average disability duration for this injury at Amerimed was 312 days. Dr. Hanna noted that Dr. Bishai was normally the treating physician on these cases.

42.     Dr. Hanna specifically provided an example of Amerimed's fraudulent activity by citing her review of the file for VA employee (identified by initials) "LJ."  On December 17, 2013, LJ was examined by VA physician Dr. Hung Tran, MD, for carpal tunnel syndrome. Dr. Tran found no evidence of carpal tunnel syndrome and prepared a report documenting his findings. LJ later sought treatment from Amerimed, however, and Amerimed informed LJ that LJ was disabled due to carpal tunnel syndrome.

43.     Dr. Hanna also questioned Amerimed use of pre-printed forms.  Dr. Hanna explained that it is impossible to provide an objective evaluation of a patient's condition using pre-printed forms.  Dr. Hanna has never seen these types of pre-printed forms at any other medical practice. As an example, Dr. Hanna referenced the patient file from another VA employee (identified by initials "NR"). On February 4, 2014, Amerimed completed a pre-printed form stating NR was examined by a doctor at Amerimed, and the doctor determined there had been no change in NR's condition.  When injured federal employees receive treatment, OWCP normally requires the physician to complete a DOL Form CA-17, a Duty Status Report. This is a one page form which lists the physical activities required for the employee's job and, in it, the physician indicates whether the employee can complete each of several activities (i.e., standing, walking, reaching above the shoulder, etc.). This form ought to be completed at the time of the medical appointment. The Amerimed doctor in this instance attached to the February 4 report a DOL Duty Status Report from two months *prior*, dated December 4, 2013. Upon noticing this, Dr. Hanna asked for clarification from Amerimed and sent back the documents. Dr. Hanna later called Amerimed, and the employee with whom she spoke dismissed her concerns.

44. In light of the above examples, Dr. Hanna has become aware of many instances where an employee initially seeks treatment for a minor injury at the VA, but returns from Amerimed with a diagnosis of a much more serious injury. Based on these observations, Dr. Hanna opines that Amerimed does this in order to "up-bill" services; that is, inflating the type and amount of CPT codes that can be billed. To support this theory, Dr. Hanna explained that, in eleven years of medical practice, Dr. Hanna has never billed a level 5 E/M (CPT code 99215) and has only once billed for a level 4 E/M visit. Remembering that level 4 E/M case clearly, Dr. Hanna recounted that the level 4 E/M rating was justified because the VA employee, who had slipped on a ladder while performing maintenance to a light fixture, was shocked by a live electrical wire and then fell 20 feet to the ground. Unlike that one aberrational case, Dr. Hanna stated that the majority of her office visits are billed at a level 2 or level 3 E/M.

45. Dr. Hanna has also noted that Amerimed, with Dr. Bishai most often as the treating physician, regularly orders what appear to be unnecessary medical tests. This conclusion has been corroborated by patients who have complained to Dr. Hanna that their condition has not improved after receiving treatment at Amerimed for up to 18 months. Dr. Hanna stated that many patients initially seek treatment at Amerimed with the intention of returning to full duty at the VA, but the doctors at Amerimed then "find" these patients to be too disabled to return to work. According to Dr. Hanna, this type of diagnosing practice breeds what she termed a "disabled mentality." Based on these practices, Dr. Hanna felt obligated to contact the VA OIG regarding Dr. Bishai and Amerimed because she considered their conduct to be an affront to the medical profession.

### Dr. William Dinenberg, M.D.

46. On or about April 9, 2014, investigators interviewed Dr. William Dinenberg, MD. Dr. Dinenberg is an orthopedic surgeon and board certified by the American Board of Orthopedic Surgery. Dr. Dinenberg has conducted Independent Medical Exams (IME) for OWCP, for the past fourteen years. In the course of reviewing the medical files of OWCP claimants, Dr. Dinenberg has identified numerous problems with the treatment provided by Amerimed. The main problem with Amerimed's activities, according to Dr. Dinenberg's observations, is what he termed its "expansion of diagnosis." Stated plainly, while many patients go to Amerimed for one injury, they leave Amerimed with several different problems and diagnoses that exceed the parameters of their initial injury. Dr. Dinenberg stated that this phenomenon happens with virtually every one of the patients at Amerimed, and is not an isolated problem. Dr. Bishai is the main physician at Amerimed and treats the majority of patients seen by Dr. Dinenberg.

47.     Dr. Dinenberg also stated that Amerimed performs an inordinate amount of tests on patients. One of the tests frequently performed by Amerimed is the soft tissue sonogram. Dr. Dinenberg has never used this test and has no idea what legitimate purpose it might serve, but it is frequently performed and billed for by Amerimed. He also noted that, despite lacking a legitimate basis for such a diagnosis, patients at Amerimed are frequently diagnosed with thoracic outlet syndrome, which is a group of disorders that occur when blood vessels or nerves in the space between the collarbone and the first rib (thoracic outlet) become compressed. Dr. Dinenberg opined that Amerimed routinely finds this diagnosis in its patients in order to bill OWCP for a thoracic outlet study. Dr. Dinenberg has observed that Amerimed also performs an inordinate number of MRI's, and that those studies are not always limited to the affected area. Dr. Dinenberg often noted that patients at Amerimed also received multiple nerve conduction studies which were of little medical value based on the diagnosed condition.

48.     Another problem identified by Dr. Dinenberg is the amount of physical therapy performed at Amerimed. He stated that a patient with a sprained ankle should normally receive no more than six weeks of therapy because, beyond that point, there is no medical benefit derived from it. Despite that, Dr. Dinenberg has noted that such a patient would receive physical therapy for a sprained ankle for years at Amerimed. He stated that this is a common problem with patients at Amerimed – they receive physical therapy for a period of time well beyond what is medically necessary or advisable. Furthermore, patients at Amerimed also receive an inordinate amount of ultrasound treatment, electro stimulation, massage, and physical manipulation. Amerimed patients also frequently receive acupuncture which Dr. Dinenberg described as "hocus pocus." In essence, Dr. Dinenberg stated that there is no medical justification for many of the therapies routinely prescribed for patients at Amerimed.

49.     Dr. Dinenberg has also observed that the physicians at Amerimed "always find something" wrong with their patients and their tests never come back negative. Accordingly, Dr. Dinenberg "doesn't trust Amerimed reports. I send them out for a real study." Dr. Dinenberg stated that Amerimed "finds" approximately 95% of their patients to be totally disabled when in reality only 5% of them are actually totally disabled. Dr. Dinenberg has routinely examined patients who were willing and physically able to return to work in some capacity, despite Amerimed having found the same patient to be fully disabled.

50.     When asked about billing, Dr. Dinenberg stated that he began his career as a physician in the US Air Force and, as a result, had no experience with billing or CPT codes. When he left the Air Force and began his civilian career, Dr. Dinenberg initially billed all of his office visits at a level 5 E/M (CPT code 99215) because he was

not familiar with the proper billing regulations.  Once this problem was brought to his attention, Dr. Dinenberg immediately ceased that practice.  In fact, in the 14 years of his practice since then, Dr. Dinenberg has never billed an office visit at a level 5 E/M.  In the case of a serious trauma as an initial visit, Dr. Dinenberg stated that billing for a level 4 E/M visit might be appropriate, such as with a patient involved in an auto accident.  Dr. Dinenberg added, however, that it would never be appropriate to bill a level 4 or level 5 for an orthopedic follow-up visit. Dr. Dinenberg added that he might bill a level 3 office visit for the initial visit and normally bills follow-up visits at a level 2.

51.    In sum, Dr. Dinenburg opined that Amerimed's practice generally and treatment of patients individually is "egregious" and "excessive." Dr. Dinenberg added that the doctors at Amerimed, like Dr. Bishai, "give the profession a black eye."

### Dr. Murthy Ravipati, M.D.

52.    On or about February 25, 2014, investigators interviewed Dr. Murthy Ravipati, MD, who was formerly a physician at Amerimed. Dr. Ravipati practiced as a physician with Amerimed for several months from in or about the spring through the summer of 2013. He stated that 99% of the patients they treated were injured federal employees, mostly from the Postal Service and the VA.  Dr. Ravipati was ultimately "let go" after Amerimed hired another physician, Dr. Claude Barosy, and the number of patients seen by Dr. Ravipati began to decline. As an Internist, Dr. Ravipati was hired to see non-workers'-compensation patients, but Amerimed had very few non-OWCP patients.  Dr. Samy Bishai was the lead physician, and he saw the most patients. Dr. Ravipati stated that Lois Luis was usually at Amerimed, running the day-to-day operations.

53.    Dr. Ravipati observed that many Amerimed patients received treatment for periods of time far in excess of what was normally required to treat their injury. In Dr. Ravipati's experience, patients with similar injuries should have received treatment for several months, while at Amerimed these same patients were getting treated for years. Dr. Ravipati noted that some patients would complain about the frequency of visits and the overall length of treatment.

54.    According to Dr. Ravipati, Dr. Bishai was "running the show" at Amerimed. Dr. Bishai's attitude was to continue the patient's treatment for as long as possible such that the DOL would not "cut them off." Dr. Ravipati acknowledged that many patients were often complicit with this philosophy as they were not eager to return to work.

55.     Dr. Ravipati also observed that patients were receiving too many MRI's at Amerimed, well beyond what was medically necessary. Additionally, patients would receive unnecessary vascular ultrasound tests. These tests served no purpose for the vast majority of the injuries (i.e., neck and back) for which the federal workers' compensation patients were being treated. Dr. Ravipati stated that Dr. Barosy also questioned the necessity of these vascular ultrasound tests.  In fact, Dr. Ravipati recalled one occasion when he (Dr. Ravipaiti) refused to sign an authorization form to perform a vascular ultrasound on a patient who had already received the test. Dr. Ravipati also observed that patients at Amerimed would receive multiple nerve conduction tests which, after given once, were unnecessary.

56.     Dr. Ravipati characterized the treatment philosophy at Amerimed as "overutilization." He stated that if one compared the treatment(s) provided by private insurance companies for similar injuries, one would find that it normally lasted for several months, whereas the treatment for the same injuries at Amerimed could last for years.

57.     While working at Amerimed, Dr. Ravipati would only see approximately six or seven patients a day. Dr. Bishai would see up to 15 patients a day. Dr. Ravipati stated that he would complete a "superbill" for each patient, indicating the treatment provided and the corresponding CPT code. With respect to billing for various levels of E/M, Dr. Ravipati stated he would normally bill for a level 2 or level 3 E/M visit. Dr. Ravipati could not recall ever billing for a level 5 E/M visit for any patient during his time at Amerimed.

58.     When he learned that Dr. Bishai was billing almost every patient as a level 5 E/M visit, Dr. Ravipati stated that it was "excessive." He said it would be "impossible" for Dr. Bishai to complete that number of level 5 office visits in a single day.

59.     Dr. Ravipati stated that MRI's were completed at another location and the MRI reports would be examined by another physician, Dr. Timkin. Since the MRI reports were already reviewed by another physician, Dr. Ravipati would not bill separately for his review of the patient's MRI.  Dr. Ravipati would normally spend about ten minutes reviewing the patient file prior to seeing the patient.

## FORMER AMERIMED EMPLOYEES

### Former Employee 'DL'

60.     On or about February 11, 2014, investigators interviewed a former Amerimed employee, identified by initials "DL."  DL was employed as a Medical

Assistant at Amerimed from September 2009 through June 2013. DL stated that Ireno Luis (a/k/a Lois Luis) controlled the entire Amerimed operation while DL was working there. When DL was hired, Amerimed primarily saw automobile accident victims and individuals who were able to self-pay. In 2011, however, DL noticed that Amerimed transitioned to serving federal workers' compensation claimants, which coincided with the hiring of Dr. Samy Bishai. By the time DL left Amerimed in June 2013, its patients were almost exclusively OWCP claimants.

61.    While at Amerimed, DL noticed that Luis placed a lot of pressure on Dr. Bishai to see more patients. DL described Amerimed as a "patient factory." Due to such a high volume of patients seen at Amerimed, DL believes that the patients are not getting the best possible care. DL even heard Dr. Bishai complain to Luis that Dr. Bishai required more time with patients, but Luis would not allow it.

### Former Employee 'MA'

62.    On or about February 25, 2014, investigators interviewed another former Amerimed employee, identified by initials "MA." MA worked as a receptionist at Amerimed from January through June 2013. MA stated that Dr. Samy Bishai was the primary physician at Amerimed. On a regular day, Bishai would see between twelve and seventeen patients. MA heard Bishai constantly complain to Luis and other employees about the high number of patients the office scheduled for Dr. Bishai each day.

63.    MA stated it was common for Dr. Bishai to spend an hour or longer with patients for their initial visit, but when returning for subsequent visits, Bishai would only spend between 10 and 15 minutes with them. Based on these observations, MA advised that it would not be accurate for Amerimed to be mostly billing for level 5 E/M visits.

64.    MA also corroborated that Lenny Perez was a representative for the OWCP claimants that come to Amerimed. MA has seen Perez at Amerimed's offices on at least two occasions, and Perez would frequently call Amerimed to obtain patient information. Perez refers patients to Amerimed. MA noted that Dr. Bishai and Perez appear to have known each other for a while based on their level of interaction at the office. MA recalled that Amerimed staff members and Dr. Barosy had gone to Perez's office to receive tips and training on how to deal with OWCP claims.

65. Prior to a patient visit, MA stated Dr. Bishai would take one to two minutes to review the patient's medical file. Beyond that, MA was unaware of any additional or extended time Dr. Bishai spent reviewing medical records prior to seeing patients.

66. MA heard many patients at Amerimed complaining about the high frequency of nerve conduction studies and MRI's they had to undergo at Amerimed. MA stated that Luis would direct MA and other staff members to review medical files for the sole purpose of locating patients who hadn't had nerve conduction studies or MRI's in the last few months. Once located, Luis would require the staff to reschedule the patients for testing without any review or concurrence from one of the doctors.

67. MA recalls that Dr. Eric Corpse, a chiropractor, would treat patients at Amerimed every other week. Luis instructed MA and other Amerimed staff to search through Amerimed's patient files and, prior to Corpse's anticipated arrival, find at least ten people for Corpse to examine.

68. Luis would also instruct Amerimed support staff to review patient files to determine what supplies or durable medical equipment (DME) patients had received. For example, the types of DME that Amerimed would routinely provide included canes, neck braces, back braces, and arm slings. In fact, Luis, along with another Amerimed employee, Oscar Torres, would assist in this file review process. Once the patients who had not recently been issued supplies or DME were identified, Luis would require the staff to dispense those items to patients. Notably, the physicians had no involvement with this process.

### *Former Amerimed Chief Executive Officer (CEO) Mary Manso*

69. On or about June 17, 2014, Mary Manso was interviewed by agents regarding Amerimed. Manso stated that she served as the Chief Executive Officer of Amerimed at the main Tampa office, the MLK location, from approximately January 2012 until July 2013, when she transferred to run the newly opened branch in Bayamon, Puerto Rico. Manso recently left that branch and Amerimed due to some of the unethical practices she observed while working there. Manso then contacted the USPS OIG.

70. When speaking with investigators, Manso stated that Amerimed is currently run by Lois Luis. Luis was raised by Manso's father, Guillermo Manso, who founded Amerimed, but when Guillermo suffered a broken neck, Luis took over the operation of the company. When the business was run by Manso's father, Amerimed saw limited numbers of patients with OWCP claims. Under Luis, however, that number

has dramatically increased. Now Amerimed almost exclusively treats patients from the USPS, US Veterans Administration (VA), and the Transportation Security Administration (TSA).

71.     According to Manso, Luis and his business partner, Oscar Torres, set up the Puerto Rico office, which Mary Manso opened on or about July 18, 2013. She was in charge of the office there until she left approximately one month prior to the interview in the summer of 2014.

72.     Luis directed that every OWCP claimant in the Puerto Rico office receive a Nerve Conduction Velocity (NCV) study, Thoracic Outlet Study, and a soft tissue sonogram, regardless of their injuries or diagnosed condition. This pattern of unnecessary tests was identified in the review of patient records throughout Amerimed's other offices as well. These tests were not ordered by their physician and every OWCP claimant received this "package" of tests. The NCV studies were conducted by a firm from Miami, Florida, called South Eastern Imaging. They came to Puerto Rico in August 2013 and again in September 2013 and conducted 20 NCV studies on each trip. Manso stated that she believed these tests were conducted simply to increase Amerimed's billing. Manso also stated that on one occasion Luis called her on a Sunday and told her that the podiatrist, Dr. Gonzales, would be at the Amerimed office on Monday. He directed Manso to "fill her up," directing Manso to schedule as many patients as possible to see Dr. Gonzales. Patients were also scheduled to see the chiropractor, Eric Corpse.

73.     The Tampa clinic is the main office for Amerimed and handles the billing for all of the branch offices.  Manso stated that she would scan all medical reports and other documents relating to the treatment provided to patients in Puerto Rico and then email via interstate wires these reports to Amerimed. The MLK Location would then bill OWCP based on the documents provided from the branch offices. In addition to the original documents maintained in the patient's file in the branch offices, the MLK Location, would also maintain a copy of those documents in the file.  Accordingly, each patient from Puerto Rico would have a local file and a file in Tampa that would be a "mirror image" of each another.  Manso stated that every office also keeps of log of all the patients who come into the office every day and this log is stored at the office for approximately eight months.

74.     Manso stated that patients rarely leave Amerimed. At one point, Luis told Manso, stating in substance that, "these are patients for life. They will be here forever." Manso stated that this was a "company policy" at Amerimed. Eventually Manso realized that many of these patients did not have chronic conditions and did not need to be

treated over extended periods of time. She realized what Amerimed was doing was not right, and this was one of reasons Manso decided to leave Amerimed.

## AMERIMED PATIENTS

### Patient 'JM'

75.     On or about January 22, 2014, investigators interviewed injured Postal Servic employee, identified by initials 'JM,' who had previously received treatment at Amerimed from in or about late 2011 through in or about July 2012. Initially, JM explained that other Postal Service employees had referred JM to see Lenny Perez from Federal Workers Compensation Consultants (FWCC).  Perez told JM that JM must receive treatment from Dr. Bishai at Amerimed. During the initial visit at Amerimed, JM met with Dr. Bishai for approximately five minutes.  When JM checked the online billing for the visit the following day, JM discovered that Amerimed billed $800 for the visit, and LM complained to OWCP.  Based on JM's initial visit at Amerimed, Dr. Bishai urged JM to receive physical therapy twice a week.   JM stated, however, that none of the physical therapy helped LM's condition in any way. At Amerimed, JM also received two nerve conduction studies, an MRI and X-rays, even though JM's previous physician had already performed an MRI and X-rays. Based on the experience JM had at Amerimed, JM told Perez that JM did not want to receive any more treatment there.  As a result, Perez refused to work with JM. When JM went to Amerimed to pick up JM's file, JM spoke with Dr. Bishai and told him that JM was no longer working with Perez. Dr. Bishai called Perez and attempted to reestablish their business relationship, but to no avail.

### Patient 'PM'

76.     On or about February 21, 2104, another injured Postal Service employee, identified by initials 'PM,' was interviewed. PM explained that Bill Hackney, a colleague of Perez's at FWCC, referred PM to Amerimed.  While a patient at Amerimed, PM received several MRI's and nerve conduction studies.  PM was also forced to accept various medical supplies that PM had never requested. PM described that the patient visits with Dr. Bishai never lasted more than 15 minutes.

## UNDERCOVER OPERATION

77.     From on or about August 8, 2013, through on or about September 23, 2013, an undercover (UC) operation was conducted at MLK Location. Two undercover USPS OIG Agents went to Amerimed posing as injured Postal Service employees.

78.    On or about August 8, 2013, Undercover Agent 1 (UCA 1) was examined by Dr. Barosy complaining of a back injury. UCA 1 was not actually suffering from a back injury, but Dr. Barosy diagnosed him with the following:

- lumbosacral disc disease;
- thoracolumbosacral disc syndrome; and
- radiculopathy or right and left legs.

Based on those conclusions, Dr Barosy recommended the following therapy for UCA 1 to be administered three times per week for three months: infrared therapy (CPT Code 97026), manual therapy (97140), therapeutic exercise (97110), ultrasound (97035), massage (97124), electro stimulation (G0283), and hot/cold packs (97010).  Dr. Barosy also ordered acupuncture once a week for two months, an MRI, X-Ray, and a nerve conduction study. Amerimed billed for a level 5 office visit (99215) and for additional reports (99080), but only one exam report was submitted as evidence, none of which was sufficient to justify the additional report billing.

79.    On or about August 15, 2013, UCA1 received an MRI for which Amerimed billed $4,839 and an additional $436 under modifier 26 for an additional review the following day. Documents show that the review of the MRI was conducted by Dr. Mark Timkin as part of the MRI exam, but no additional report was completed the following day.  The documentation in the file does not support this additional charge.

80.    On or about September 3, 2013, UCA 1 was examined by Dr. Barosy. Based on that exam, Amerimed billed OWCP for the exam and for additional reports, but Dr. Barosy completed only a one-page DOL Form as part of the exam.

81.    On or about September 4, 2013, UCA 1 received physical therapy at Amerimed.  Based on that exam, Amerimed billed for additional supplies, yet no supplies were used or provided to UCA 1.

82.    On or about September 17, 2013, UCA 1 again saw Dr. Barosy for 19 minutes, but Amerimed billed for a level 5 E/M visit.  Amerimed also billed for additional reports, yet Dr. Barosy only completed a one-page DOL Form in addition to the normal exam report.

83.    On or about August 21, 2013, Undercover Agent 2 (UCA 2), also complaining of a back injury, was seen by Dr. Bishai. UCA 2 was not, in fact, suffering from a back injury, but Dr. Bishai referred him for an X-ray and an MRI, and diagnosed him with:

- Lumbar disc syndrome with radiculopathy bilateral; and
- Herniated lumbar disc.

Based on that August 21 exam, Dr. Bishai also recommended the following procedures three times per week for 12 weeks: infrared therapy, manual therapy, therapeutic exercises, ultrasound, massage, neuromuscular re-education, mechanical traction, and ice/cold packs. Dr. Bishai also recommended acupuncture for three weeks and an orthopedic device, a lumbar brace. Further testing in the form of X-rays and MRIs were also recommended.

84.    During the exam, Dr. Bishai saw UCA 2 for 34 minutes, yet billed for a level 5 E/M visit and for additional reports (99080).  Only one medical report of the exam was submitted in the file, and there was no additional report completed.

85.    On or about August 23, 2013, UCA 2 received an MRI at Amerimed. Amerimed billed $2,325 for the MRI and interpretation, both of which were completed by Dr. Mark Timkin.

86.    On or about September 26, 2013, Amerimed billed an additional $216 under modifier 26 for the interpretation of the UCA 2's MRI, but the MRI interpretation had already been completed.

87.    From on or about September 3, 2013 to on or about September 5, 2013, UCA 2 received physical therapy at Amerimed, but Amerimed also billed for additional supplies (99070) when none were used or provided.

88.    On or about September 10, 2013, UCA 2 was again examined by Dr. Bishai.  Again, Amerimed billed for a level 5 E/M visit (99215) and for additional reports, but only the medical report of the exam was completed. There were no additional reports.  Amerimed also billed for additional supplies (99070), but no additional supplies were provided to UCA 2.

89.    Each of the claimant files contains examination reports, Duty Status Reports, and other records.  All of these documents pertaining to the UC visits were sent from Amerimed to OWCP via interstate mail or wires. OWCP requires these forms to be submitted in order for the health care provider to receive reimbursement.

### Review by Florida Department of Health

90.    On or about January 10, 2014, I met with Travis Arnold, Investigative Specialist, and Babette Agett, RN, Investigation Supervisor, Florida Department of Health, Division of Quality Assurance, in Tampa, Florida. Upon reviewing the video from the undercover operations conducted at Amerimed, Agett stated that it was readily apparent that Amerimed was not providing services correctly and was in violation of Florida Department of Health Regulations.  Based on the video, Agett commented that

Amermied "was the worst" she had ever seen.   Agett also stated that the treating physician is the "captain of the ship" and must ensure that all treatments are provided correctly and in accordance with state law.

91.   On or about February 10, 2014, I met with K.L. Redfern, Karen Hanzel, and Travis Arnold, of the Florida Department of Health (DOH), Division of Quality Assurance, to review video of the medical treatment provided to the undercover agents at Amerimed. They noted numerous problems with the treatment provided. The following table summarizes the observed problems they noted with the treatment provided at Amerimed:

| Date | UC Agent | Treatment | Problems Identified |
|---|---|---|---|
| 8/14/2013 | UCA 1 | Ultrasound | Incorrect Procedure |
| 8/14/2013 | UCA 1 | Electro-stimulation | Therapist did not heat treatment pads. |
| 8/14/2013 | UCA 1 | Massage | Therapist was providing spinal manipulation which only a licensed chiropractor can do. |
| 8/15/2013 | UCA 1 | Ultrasound | Therapist was performing procedure incorrectly - no therapeutic value. Also, therapist would stop procedure to use cell phone - violation of Florida DOH regulations. |
| 8/15/2013 | UCA 1 | Electro-stimulation | Must be performed by a registered Chiropractic Assistant. Chiropractor required to be on the premises. Amerimed has no chiropractor. |
| 9/4/2013 | UCA 2 | Ultrasound | Therapist is simply spreading the gel around. No therapeutic value. |
| 9/4/2013 | UCA 2 | Electro-stimulation | Improper placement of pads. |
| 9/5/2013 | UCA 2 | Ultrasound | Therapist using cell phone while performing therapy - violation of DOH regulations. Also, performing therapy in the wrong location. |
| 9/18/2013 | UCA 2 | Ultrasound | Therapist incorrectly performing therapy in location of the kidney which could cause injury. |

| 9/18/2013 | UCA 2 | Electro-stimulation | Incorrect placement of pads. Pads placed near kidney could cause injury. Pads should be placed near spine. Also, should spread alcohol before applying pads - therapist did not do so. |
|---|---|---|---|
| 9/18/2013 | UCA 2 | Massage | Therapist was using cell phone while performing therapy. This is a violation of Florida DOH regulations. |
| 9/19/2013 | UCA 2 | Ultrasound | Therapist was barely touching the skin and moving too fast - incorrect procedure, no therapeutic value. |

## REIMBURSEMENT TO AMERIMED

92.    As discussed above, in order to receive reimbursement for the services provided to its patients, Amerimed sent various forms and documents via interstate mails and wires to OWCP, including medical examination reports, Duty Status Reports, and test results.

93.    Since 2011, as a result of Amerimed's claims, the government has paid Amerimed over $21 million.  Since 2009, the rate of billing submitted by Amerimed steadily increased.  Between April and November 2014, Amerimed was paid approximately $5,193,441 for the treatment of injured federal employees.

94.    The following four operating accounts— each of which is held in the name of Amerimed Diagnostic Services Inc., and each of which is now closed—served as Amerimed Operating Accounts.  In other words, they received fraudulent proceeds directly from the government which they then disbursed as discussed in greater detail below.  Specifically, these Operating Accounts received the following from the U.S. Treasury Department:

- JP Morgan Chase Bank operating account number xxxxxx3305 (JP Morgan Operating Account) received $1,450,848 in electronic fund transfers from the US Treasury Department between on or about May 16, 2013, and on or about July 18, 2013. The account was closed on October 1, 2013. Records from this account show that approximately 96% of the deposits into this account were direct electronic transfers from the U.S. Treasury Department and transfers from the other Amerimed accounts;

- SunTrust Bank operating account number xxxxxxxxx7618 (SunTrust Operating Account) received $11,051,089 in electronic fund transfers from the U.S. Treasury Department between on or about July 25, 2013, and on or about July 9, 2014, when the account was closed. Records from this account show that approximately 97% of the deposits into this account were direct electronic transfers from the U.S. Treasury Department and transfers from other Amerimed accounts;

- Regions Bank operating account number xxxxxx9064 (Regions Operating Account #1), received $6,868,357 in electronic fund transfers from the U.S. Treasury Department between on or about January 6, 2011, and on or about May 9, 2013. Records from this account show that approximately 91% of the deposits into this account were direct electronic transfers from the U.S. Treasury Department and transfers from other Amerimed accounts.  The account was closed on July 22, 2013.

- Regions Bank operating account number xxxxxx1877 (Regions Operating Account #2), received $1,887,626 in electronic funds transfers from the U.S. Treasury Department between on or about July 3, 2014 and on or about August 28, 2014. Records from this account show that approximately 96% of the deposits into this account were direct electronic transfers from the U.S. Treasury Department and transfers in from the other Amerimed accounts.   The account was closed on September 18, 2014.

95.    Records for these four operating accounts show that, beginning on or about January 6, 2011 until on or about August 28, 2014, the accounts received deposits totaling over $25,183,844.  Of that, $21,257,920 came directly from the U.S Treasury Department, and $2,901,405 were composed of transfers between accounts associated with Amerimed and its associates, particulary Amerimed's Operating Accounts.  Investigators were unable to verify the legitimacy of the sources of only about 4% of the total deposits into the Operating Accounts.

## A. Funds Seized From Wells Fargo Bank Account Number 2000015847191, Held In The Name Of Amerimed Diagnostic Services Inc.

96.    Wells Fargo Bank account number 200001584719 (Wells Fargo Operating Account), held in the name of Amerimed Diagnostic Services Inc., is Amerimed's

current Operating Account. It was opened on November 15, 2002 in Tampa, Florida, with Wachovia Bank (prior to the merger between Wachovia and Wells Fargo Bank). Lois Luis was listed on the account as the authorized signor and as Amerimed's President. According to records provided by Wells Fargo Bank, since March 29, 2005 Guidover Manso has been an additional signor on the account. Since April 1, 2010, he has been listed on the account as Amerimed's Owner and President, and Lois Luis has been listed as the CEO.

97.     On or about August 13, 2014, this account became an Operating Account for Amerimed. On that date, Herberto Soler Jr., from the Accounting Department at Amerimed Diagnostic Services Inc., faxed a form SF 3881 to the U.S. DOL – OWCP, requesting that Amerimed's OWCP payments be sent to this account, rather than to Regions Operating Account #2, previously used by Amerimed (Regions Bank had informed Amerimed that it would be closing Amerimeds accounts on September 6, 2014.)

98.     Prior to the designation of this account as a receiving account for OWCP claim payments, the account's highest monthly balance in 2014 was just $9,000. In fact, on August 1, 2014, the account had a balance of just $248.00. Since September 4, 2014—when the account received its first DOL electronic funds transfer—DOL Treasury has made 23 electronic payments into the account, totaling $893,036.00 For the entire month of September, these payments, combined with a roll-over of $45,000 from the proceeds-funded Regions Operating Account #2, were the sole sources of funding for this account.

99.     In turn, proceeds deposited into this account went to pay for—among other things—utilities as well as various Amerimed employees, including Oscar Torres, Lois Luis, and Carmen Fernandez.

100.   This account not only received proceeds of Amerimed's continual health care, mail, and wire fraud, the account was also involved in financial transactions involving those proceeds that perpetuate the fraud through the payment of the company's utilities and employees.

101.   On October 1, 2014, after finding that the account was subject to forfeiture in its entirety as fraud proceeds and property intended to promote the fraud, United States Magistrate Judge Thomas G. Wilson issued a seizure warrant, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 981(b), and 982(a)(7), 21 U.S.C. § 853(f), and 28 U.S.C. § 2461(c), for the contents of the account. On or about October 2, 2014, law enforcement officers seized approximately $477,126.47 from the account.

## B. Up To $15,300 In Wells Fargo Bank Account Number 1010183883049, Held In The Name Of Guidover Manso

102.    Wells Fargo Bank personal account number 1010183883049, held in the name of Guidover Manso, was opened in Tampa, on January 13, 2009.  Guidover Manso is the sole owner and maintained signature authority on the account.

103.    From just November 27, 2013 through April 18, 2014, Guidover Manso deposited $15,300 in check payments from fraud-funded Amerimed SunTrust Operating Account into this account.

104.    On October 1, 2014, after finding that in the year prior at least $15,300 in Amerimed's health care, wire, and mail fraud proceeds were deposited into the account, United States Magistrate Judge Thomas G. Wilson issued a seizure warrant, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 981(b), and 982(a)(7), 21 U.S.C. § 853(f), and 28 U.S.C. § 2461(c), for up to $15,300 in the account.

105.    On or about October 2, 2014, law enforcement officers seized approximately $15,300 from the account.

## C. Up To $38,322 in Suncoast Schools Federal Credit Union, Account Number 3079188, Held In The Name Of Neisy Munoz and Lazaro O. Munoz

106.    Suncoast Schools Federal Credit Union account number 3079188, held in the name of Neisy Munoz and Lazaro O. Munoz, was opened on September 12, 1997, at the E. Hillsborough Avenue, Tampa branch.  Neisy Munoz established the account and Neisy Munoz and Lazaro Munoz maintain signature authority on the account. Lazaro Munoz was the manager of Amerimed's Miami clinic, and had signatory authority on an Amerimed account at Regions Bank.[2]  Neisy Munoz works in the Accounting Department at Amerimed's main office location in Tampa.

---

[2] He is also the managing member of Munoz Medical Equipment & Supply Inc., a company believed to be a shell company conducting no legitimate business activity and designed solely to conceal the true nature, ownership, and control of Amerimed's fraud proceeds funneled through its account.

107. Between August 16, 2012 and June 6, 2014, Lazaro Munoz received approximately $247,231 in checks from Amerimed. From just October 29, 2013, $38,322 in checks made payable to Lazaro Munoz, and drawn from Amerimed's SunTrust Operating Account, were deposited into this account. The Amerimed account, in turn, was funded with proceeds of health care, wire, and mail fraud.

108. On October 1, 2014, after finding that in the year prior at least $38,322 in Amerimed's health care, wire, and mail fraud proceeds were deposited into the account, United States Magistrate Judge Thomas G. Wilson issued a seizure warrant, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 981(b), and 982(a)(7), 21 U.S.C. § 853(f), and 28 U.S.C. § 2461(c), for up to $38,322 in the account.

109. On or about October 2, 2014, law enforcement officers seized approximately $38,322 from the account.

## CONCLUSION

110. There is probable cause to believe that Amerimed has engaged in a scheme to systematically defraud the US Department of Labor and the US Treasury Department through false billing practices. At its fundamental level, the scheme was driven by Amerimed billing OWCP, for unjustifiable, medically unnecessary, and/or excessive services that may or may not have even been provided to its patients. Moreover, in order to ensure a continued, if not permanent, supply of patients, the doctors at Amerimed "found" most of their patients to be totally disabled, when in fact few had conditions meriting such a diagnosis. The doctors at Amerimed also fueled this business philosophy by manufacturing injuries, syndromes, and/or symptoms in their patients.

111. Moreover, there is probable cause to believe that Lois Luis, Oscar Torres, and other employees of Amerimed caused various documents to be submitted to OWCP through wire and interstate mail, in order to receive payment for services that were either not performed, not medically necessary, and/or not provided. This, in turn, caused funds to be electronically deposited via interstate wires into the bank accounts of Amerimed.

112. Finally, there is evidence to support a reasonable belief that the United States will be able to demonstrate by a preponderance of evidence at trial that the following property is subject to forfeiture for the reasons stated below:

113.   **Approximately $477,126.47, seized from Wells Fargo Bank Account Number 2000015847191, Held In The Name Of Amerimed Diagnostic Services Inc.** (proceeds of health care, mail, and wire fraud and property intended to promote the fraud);

114.   **Approximately $15,300 seized from Wells Fargo Bank Account Number 1010183883049, Held In The Name Of Guidover Manso** (proceeds of health care, wire, and mail fraud); and

115.   **Approximately $38,322.00, seized from $38,322 in Suncoast Schools Federal Credit Union, Account Number 3079188, Held In The Names Of Neisy Munoz and Lazaro O. Munoz** (proceeds of health care, mail, and wire fraud).

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

Executed this _18th_ day of March 2015.

Kenneth P. Kelly
Special Agent
United States Postal Service
Office of Inspector General